IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Phillip S. Figa

Case No. 03-cv-01973-PSF-MJW
(Consolidated with 04-cv-02112-PSF-MJW

J.E.H. KNUTSON,

      Plaintiff,

v.

WALKER AND ASSOCIATES, INC.,

      Defendant.

---

Civil Action No. 04-cv-02112-PSF-MJW
(Consolidated with 03-cv-01973-PSF-MJW

WALKER GROUP, INC.,

      Plaintiff,

v.

FIRST LAYER COMMUNICATIONS, INC.; and
J.E.H. KNUTSON,

      Defendants.

---

## ORDER ON WALKER GROUP'S MOTION FOR PARTIAL SUMMARY JUDGMENT

---

These consolidated cases come before the Court on the motion of Walker Group,

Inc. ("Walker") filed February 28, 2005 (Dkt. # 112) requesting partial summary

judgment in its favor with respect to both claims for relief alleged against it by plaintiff

J.E.H. Knutson in Civil Action No. 03-F-1973, on its first counterclaim for relief alleged in

that case asserting "breach of guaranty" by Knutson, and on its Second Claim for Relief

alleged in Civil Action No. 04-F-2112, which also asserts a "breach of guaranty" by

Knutson.  Knutson filed his response to the motion for partial summary judgment on

March 28, 2005, and Walker filed its reply in support of motion on April 15, 2005.  This

case has recently been re-set for a four-day trial to a jury commencing October 25,

2005.  A brief description of the background of these consolidated cases will put this

motion in perspective.

**BACKGROUND**

On October 10, 2000, First Layer Communications, Inc., ("First Layer"),

a Colorado corporation and a defendant in Civil Action No. 04-F-2112, and Walker

entered into a "Revolving Convertible Note Purchase Agreement" ("Agreement")

pursuant to which Walker agreed to lend up to $500,000 to First Layer pursuant to

a promissory note, security agreement and personal guarantees from individuals

who were principals in First Layer, including Knutson.  *See* Exhibits A, B, C and D

to Affidavit of Douglas Leckie, III ("Leckie Affidavit") attached to Walker's Motion.

The Agreement also makes reference to a "Stock Purchase Warrant," but no copy of

such warrant has been provided to the Court.  See Exhibit A to Leckie Affidavit at 3.

The Agreement provides that it shall be governed by and construed in accordance with

the laws of North Carolina.  *Id.* at ¶ 6.9.

The $500,000 promissory note executed on by Knutson on behalf of First Layer

on October 10, 2000 provides that the note is payable in full on October 10, 2002.

*See* Exhibit B to Leckie Affidavit at 1.  The security agreement executed by Knutson

on behalf of First Layer on October 10, 2000 grants Walker a security interest in all of First Layer's right, title and interest in an array of assets, including "all accounts, contract rights, instruments documents, chattel paper, general intangibles," as well as in "all books, documents, records, files, customer lists, correspondence, computer programs," and in "all proceeds, products, rents, and profits of or from any and all of the aforesaid Collateral." *See* Exhibit C to Leckie Affidavit at 1-2.  The security agreement provides that it shall be governed by and construed in accordance with the laws of North Carolina. *Id.* at ¶ 19.  The "Guaranty" signed by Knutson individually on October 10, 2000 "unconditionally guarantees" to Walker "the full and prompt payment or performance of the Obligations" of First Layer. *See* Exhibit D to Leckie Affidavit at 1.

On May 16, 2001, Walker and First Layer entered into a "First Amendment" to the Agreement, pursuant to which Walker agreed to lend an additional $100,000 to First Layer and pursuant to which the maximum principal amount of the promissory note was increased to $600,000. *See* Exhibits E and F to Leckie Affidavit at 1.  On the same day Knutson executed a "First Amendment to Guaranty of J.E.H. Knutson" pursuant to which the amount of the note subject to the Guaranty was increased to $600,000. *See* Exhibit G to Leckie Affidavit at 1.  It is unclear whether the other principals of First Layer also executed amendments to their personal guarantees.

On or about September 18, 2001, it appears that a "Second Amendment to Guaranty of J.E.H. Knutson" was prepared.  This amendment provides for a guarantee by the First Layer principals of amounts lent by Walker to First Layer in excess of $600,000, but provides that for the excess amount the guarantors would be liable in

3

proportion to their *pro rata* ownership in First Layer.  *See* Exhibit H to Leckie Affidavit

at 1.  According to a recital in the "Second Amendment," Knutson owned 29.63% of the

capital of First Layer, and thereby would be guaranteeing to Walker that percentage of

any amount over $600,000 lent by Walker to First Layer.  Walker apparently has been

unable to locate a copy of the "Second Amendment to Guaranty of J.E.H. Knutson"

actually signed by Knutson.  *See* Exhibit E to Knutson's Response, Walker's

Responses to Knutson's Second Set of Requests For Production at 4.  Knutson

admits executing a second amendment to his Guaranty on September 18, 2001

(*see* Exhibit A-6 to Defendant's Motion, Plaintiff's Response to Requests For Admission

at ¶ 7) but as no copy of the second amendment was attached to the requests for

admissions, he argues that "the terms of the second amendment are in doubt."

(Knutson's Response to Motion for Partial Summary Judgment at 8).  Walker asserts

that pursuant to the Second Amendment to the Guaranty, Walker lent First Layer funds

in excess of $600,000 in September, November and December of 2001, which brought

the total funds loaned by Walker to First Layer to a principal balance of $1,013,867.70.

*See* Leckie Affidavit at ¶¶ 9, 10, and 12.

 First Layer was formed in the summer of 2000, prior to the transaction with

Walker, for the purpose of performing installation services in the telecommunications

industry.  *See* Affidavit of Knutson, Exhibit C to Knutson's Response at ¶ 1.  It appears

that the loan from Walker provided the initial funding for First Layer.  Unfortunately, First

Layer started operations at approximately the same time as the telecommunications

bubble burst.  According to Knutson, by September 2002 First Layer was having

financial difficulties and it became clear that it could not afford to pay its debt to Walker under the note.  *Id* at ¶ 8.  On September 13, 2002, First Layer's Board of Directors, including Knutson, voted to dissolve First Layer and liquidate the company's assets.  *See* Leckie Affidavit at ¶ 14.  In September 2002, shortly after the vote to dissolve First Layer, David Menzel, a principal of First Layer, voluntarily packed up physical assets from the Kansas City office of First Layer and shipped them to Walker Group.  *See* Affidavit of Menzel, Exhibit A to Knutson's Response at ¶ 3.

The note to Walker matured on October 10, 2002 without any payments having been made by First Layer (Leckie Affidavit at ¶ 16).  On July 9, 2003 Walker Group made a demand to Knutson for payment under his personal guaranty (*Id.* at ¶ 19).

## THE PARTIES' CLAIMS AND DEFENSES

On August 12, 2003, Knutson filed his complaint for declaratory judgment in Boulder County District Court seeking a declaration that he is not liable to Walker for any amounts pursuant to the note or his Guaranty because Walker had received assets from First Layer "that more than satisfy First Layer's obligations to Defendant under the Note" and therefore satisfy Knutson's obligation under the Guaranty (Complaint in Case 2003-CV-1643, Boulder County District Court, at ¶ 9).  In October 2003,  Walker Group timely removed the case to this Court pursuant to 28 U.S.C. § 1441 and it was assigned Civil Action No. 03-1973.  On October 21, 2003, Knutson filed a First Amended Complaint which appears to differ from his original complaint only in the allegations asserting federal jurisdiction and venue.  On November 25, 2003, the case was reassigned to the undersigned judge.

In the interim, on September 18, 2003 Walker Group, a North Carolina corporation, filed an action in a North Carolina state court against First Layer and Knutson alleging a First Claim For Relief against First Layer for breach of contract on the note, and a Second Claim for Relief against Knutson for liability on his individual guaranty of the note and amendments thereto.  On October 17, 2003, Knutson removed that case to the United States District Court for the Middle District of North Carolina. First Layer made no appearance in the case and on January 16, 2004 the North Carolina Court entered default against First Layer.  On August 24, 2004, that case was transferred to this Court and assigned Civil Action No. 04-F-2112.  By Order entered on November 8, 2004, the two cases were consolidated before the undersigned judge.

On February 2, 2004, Knutson moved to amend his complaint against Walker by the filing of a Second Amended Complaint.  By Order entered on May 27, 2004, this court granted Knutson's motion for leave to filed the Second Amended Complaint.  The Second Amended Complaint added a Second Claim for Relief against Walker alleging "deceit based on fraud" in connection with the execution of First Layer's note and Knutson's Guaranty.  On June 24, 2004, Walker filed its answer to Knutson's Second Amended Complaint and asserted three counterclaims against Knutson.  The First Counterclaim against Knutson alleges breach of his Guaranty and amendments thereto. The Second and Third Counterclaims allege claims for fraud and, in the alternative, negligent misrepresentation by Knutson, with respect to his representations of his financial ability to perform his obligations under the Guaranty.

**WALKER'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

On February 28, 2005, after the close of discovery and in accordance with the scheduling order entered in the case, Walker filed its motion for partial summary judgment.  Walker requests summary judgment as to (a) both claims against it contained  in Knutson's Second Amended Complaint, that is, his claim for a declaratory judgment that he is not liable to Walker on his Guaranty and his claim alleging deceit based on fraud, and (b) on Walker's own Second Claim for Relief alleged against Knutson, as well as on its First Counterclaim for Relief against Knutson, both of which allege liability on his Guaranty and the amendments thereto.

Walker first contends that there are no questions of material fact regarding the execution of the Guaranty and the amendments thereto, or as to the amounts that are due under the Guaranty.  According to Walker the amount it loaned to First Layer totaled at least $1,013,867.70.  It appears undisputed that First Layer made no payments on the loan balance.  Walker contends that Knutson is therefore jointly and severally liable under his Guaranty and the first amendment thereto for $600,000, and under the second amendment thereto for 29.63% of the excess over $600,000 or an additional $122,628.99, for a total liability of $722,628.99, plus interest.  *See* Leckie Affidavit at ¶¶ 12-13.

Walker also contends that Knutson has failed to adduce sufficient evidence to establish even a *prima facie* case to support his Second Claim for Relief against it sounding in fraud, as discussed below in more detail, so that there are no facts that must be hear by a jury.

7

Knutson responds that questions of material fact preclude summary judgment as to all the claims.  With regard to the claims relating to his Guaranty, Knutson asserts that First Layer's obligation was satisfied, in part or entirely, by Walker Group's receipt of assets from First Layer in September 2002.  He also challenges his liability under the second amendment to the Guaranty, since a signed copy has not been produced and according to Knutson the terms are "in doubt."  With regard to the fraud claim, Knutson responds with an affidavit containing assertions that the statements made to him were false and that he relied on them to his detriment (Knutson Affidavit, Exhibit C to Knutson's Response).

**STANDARD OF REVIEW**

Summary judgment is appropriate under F.R.Civ.P. 56(c) if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  *See also Celotex v. Catrett*, 477 U.S. 317, 322-23 (1986).  When applying this standard, the Court reviews the pleadings and the documentary evidence in the light most favorable to the nonmoving party.  *Gray v. Phillips Petroleum Co.*, 858 F.2d 610, 613 (10th Cir. 1988).  To defeat a properly supported motion for summary judgment, "there must be evidence upon which the jury could reasonably find for the plaintiff."  *Panis v. Mission Hills Bank*, *N.A.*, 60 F.3d 1486, 1490 (10th Cir. 1995), *cert. denied*, 516 U.S. 1160 (1996), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  In addition, "'where the non-moving party will bear the burden of proof at trial on a dispositive issue' that party must

'go beyond the pleadings' and 'designate specific facts' so as to 'make a showing sufficient to establish the existence of an element essential to that party's case' in order to survive summary judgment." *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1128 (10th Cir. 1998) quoting *Celotex, supra*, 477 U.S. at 322.

For purposes of the present motion, Knutson is the plaintiff and non-moving party with respect to his claim of deceit based on fraud.  In order to avoid summary judgment on his claim of fraud, Knutson must demonstrate more than conclusory allegations of fraud.  In the Tenth Circuit conclusory allegations alone are not sufficient to defeat a motion for summary judgment.  *See e.g. White v. York Intern. Corp.*, 45 F.3d 357, 363 (10th Cir. 1995);  *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 530 (10th Cir. 1994).

With respect to the parties' respective claims relating to Knutson's liability under his personal Guaranty, Walker as the holder of the Guaranty meets its *prima facie* burden by proving the existence and validity of the Guaranty, and the amounts due under it.  *See Resolution Trust Co v. Southwest Development Co.*, 807 F. Supp. 375, 377-78 (E.D.N.C. 1992), *aff'd in part and rev'd in part on other grounds*, 14 F.3d 596 (4th Cir. 1993).  The burden of proving that the loan has been satisfied, or that the Guaranty should be released for some reason, is in reality an affirmative defense as to which the burden of proof falls on Knutson.  *Id.* at 378.

**ANALYSIS**

For the reasons set forth below, the Court finds that summary judgment must enter as to Knutson's claim of fraud based on deceit, as he has failed to establish even the existence of a dispute as to specific facts that require resolution by a jury.

The Court finds that material disputes of fact preclude summary judgment at  this time with respect to Walker's claims as to the liability of Knutson under his Guaranty.

The Court finds that summary judgment should enter in favor of Walker and against Knutson on his claim for a declaratory judgment that he has no liability under his Guaranty.

**Knutson's Fraud Claim**

In his Second Amended Complaint, Knutson alleges that on or about September 7, 2000, in a meeting concerning negotiations regarding the First Layer note and his personal Guaranty, Rick Walker and Mark Walker, principals of Walker Group, knowingly misrepresented the following facts regarding Walker's business:

(1)     that Walker Group, and/or its affiliates, had an abundance of work for First Layer, when in fact, no such work was forthcoming;

(2)     that Walker Group, and/or its affiliates, had enough installation business to occupy eight full time, four-person, crews when, in fact, no such work was forthcoming or anticipated;

(3)     that Walker Group, and/or its affiliates, had in excess of 20 sales representatives selling installation services, when, in fact, far fewer of its sales

representatives were selling installation services at that time and even one year later, only 1-2 of its sales representatives were even attempting to sell installation services. Second Amended Complaint at ¶ 17.

Knutson alleges that these misrepresentations were material because they induced him to sign the personal Guaranty and caused him to turn down what he describes as a "lucrative offer" from Telect, Inc. ("Telect") to acquire First Layer as a subsidiary and employ him in a full-time position.  *Id.* at ¶ 22.  Knutson alleges that he suffered damages consisting of the "financial gain he would have realized from the Telect acquisition and the employment offered pursuant thereto" and his potential liability under the guaranty.  *Id.* at ¶ 24.

Walker Group contends that it is entitled to summary judgment on this claim for three reasons.  First, because under Colorado law "mere promises to provide future work cannot be the basis for fraud."  Second, because Knutson's alleged reliance on promises to provide future work was "unreasonable as a matter of law."  Third, because Knutson's position in this case is inconsistent with the position taken by him in a lawsuit filed against him by Telect (Defendant's Motion at 21).

In order to prevail on a claim for fraud under Colorado law, a plaintiff must establish: (1) a false representation of a material existing fact; (2) knowledge on the part of the one making the representation that it was false; (3) ignorance on the part of the one to whom the representation was made of its falsity; (4) the representation was made with an intention that it be acted on; and (5) the representation resulted in damage.  *Concord Realty Co. v. Continental Funding Corp.*, 776 P.2d 1114, 1117-18

(Colo. 1989).  However, as the Colorado Supreme Court further explained in *Brody v. Bock,* 897 P.2d 769, 776 (Colo. 1995), a claim of fraud may be premised on a party's promise concerning a future event, if that promise is coupled with a present intention not to fulfill the promise.  *See also H & H Distrib. v. BBC Int'l*, 812 P.2d 659, 662 (Colo. App.1990) (fraud cannot be predicated upon mere nonperformance of a promise, but a promise concerning a future act combined with present intention not to fulfill that promise can be actionable fraud).

Knutson does not assert that the statements attributed to the Walker principals were promises combined with a present intention not to perform.  Rather, Knutson responds that the his complaint alleges "actionable misrepresentations of present fact, rather than 'mere promises of future work.'" (Plaintiff's Response at 11).  He argues that the statements were misrepresentations of present facts that were false at the time they were made (Knutson's Response at 12).  He further argues that his positions in the two lawsuits are not inconsistent, and that his reliance was reasonable.  The Court finds it necessary to address only Knutson's first response.

To support this contention that Walker made false statements of present facts to him, Knutson offers only his affidavit and his own answers to Walker's interrogatories.

In his affidavit Knutson states: "Relying on these statements, we [First Layer] hired crews to perform the installation work Walker said it had.  However, when we told Walker we were ready to proceed, there was very little work to do.  Walker simply did not have the work it said it had."  Knutson Affidavit dated March 28, 2005, Exhibit C to

Knutson's Response at ¶ 6.  Knutson states that he "had direct knowledge of these events" as he was First Layer's president.  *Id.*

The affidavit, however, does not specify when First Layer was "ready to proceed," nor does it indicate that the time when it was ready to proceed coincided with the date on which the Walker principals made the alleged representations regarding having an abundance of work.  Moreover, in his deposition testimony Knutson describes the process of First Layer hiring project managers, crew people, leasing space and bringing in two design engineers in anticipation of doing the expected work, which was apparently completed by September or October of 2001, but states that the work did not then materialize.  *See* Transcript of Knutson Deposition, Exhibit A-1 to Walker's Motion at 110-11.  The fact that work from Walker did not materialize at some later date is not evidence that the work did not exist when the alleged representations were made in September 2000.

In his interrogatory answers, Knutson merely restates the allegations set forth in paragraph 17 of his Second Amended Complaint.  *See* Exhibit G to Knutson's Response, Knutson's Second Supplemental Response to Walker's Interrogatories, at 1-2.  He then states: "Rick Walker had direct knowledge of the falsity of these representations because he was intimately involved in Defendant's sales operations . . . ."  *Id.*  This unsubstantiated assertion of knowledge on the part of another does not constitute admissible evidence of the alleged falsity of the statements.

Similarly, Knutson offers no evidence to support his allegation that the Walker principals misrepresented the numbers of its sales representatives.  He states in his

affidavit that he "did not have the ability to meaningfully analyze Walker's internal information on its sales force." Knutson Affidavit, *supra*, at ¶ 7.  Rather, he relies solely on the allegations of his complaint that "even one year later" only "1-2 of its [Walker's] sales representatives were even attempting to sell installation services."  Second Amended Complaint at ¶ 17c.  Again, even taking such allegation as true, it does not establish that the statements allegedly made on September 7, 2000 were false when they were made.

Under Colorado law a party does not sustain his burden of proving that a statement was false and fraudulent at a given time merely by showing that at a later time the statements are false.  *See Continental Bank & Trust Co. v. Tri-State General Agency, Inc.*, 185 F. Supp. 208, 211 (D. Colo. 1960) (evidence of a company's financial difficulties in December 1954 is "unquestionably inadequate" to prove that financial statements and the representations of a company's officers and agents were false and fraudulent in 1952 and 1953 when the defendant relied on them and purchased the stock.).

Plaintiff Knutson has had ample opportunity in this case to take discovery of Walker and obtain admissible evidence of the alleged falsity of the statements described in his fraud claim.  Yet, he offers no objective evidence that the alleged representations were false at the time they were made.  Rather, he comes forward only with the conclusory assertions in his affidavit and reiteration of the allegations of the Second Amended Complaint.  Such assertions do not provide the "specific facts" so as to make a showing sufficient to establish the existence of an element essential to

his case, namely that the alleged statements were false when made.  Accordingly,

Knutson's claim of fraud cannot survive a motion for summary judgment.

**Knutson's Defenses To the Claim on His Guaranty**

In response to Walker's motion for summary judgment regarding liability on his
Guaranty, Knutson contends that the evidence shows that the First Layer note was fully
"satisfied" by the assets shipped to Walker in September 2002, or that there is at least a
dispute of fact as to value of the assets shipped so as to prevent entry of summary
judgment for $722,628.99 as requested by Walker (Knutson's Response at 2-5).
In support of this position, Knutson submits an affidavit from David Menzel, a founder
of First Layer who became an employee of Walker, regarding the shipment of assets,
deposition testimony by Peter Steel, apparently another First Layer employee who went
to work for Walker, and a valuation report from Lari Masten dated November 30, 2004,
who is tendered by Knutson as an expert witness on valuation.[1]

As noted above, Mr. Menzel states that "shortly after" the First Layer Board of
Directors voted to liquidate the company on September 13, 2002, he "packed up all the
assets in FLC's [First Layer's] Kansas City Office" and "shipped them to Walker, either
to its Welcome, NC office or to the office of Pete Steele, who had just taken charge of
Walker's new installation services group."  Menzel Affidavit, Exhibit A to Knutson's
Response at ¶¶ 2-3.  He further states that the assets packed and shipped "included
(without limitation): customer lists, customer files, contact lists, contracts, Master
Services Agreements, including specifically those of Qwest and AT&T Wireless
Services, certifications, documents evidencing plans and processes, financial

---

[1]   Ms. Masten's report is referred to in Knutson's Response to Walker's Motion for
Partial Summary Judgment, but is not attached thereto (Knutson's Response at 2).  A copy
of Masten's report, however, is attached as Exhibit B to Walker's Motion to Exclude Expert
Witness, filed February 28, 2005, as well as to Knutson's response to that motion.

information, books and other printed materials, computers and other electronic equipment." *Id.* at ¶ 3.  Mr. Menzel does not state what he believes to have been the value of the assets he shipped.

Plaintiff Knutson, when asked in his deposition given on March 25, 2004, what value he assigned to the assets transferred to Walker, answered: "Minimal. Ten Thousand."  Knutson Deposition excerpts, Exhibit A-1 to Defendant's Motion at 209. Taking this answer to mean that Knutson admitted the shipped assets had a value of $10,000, Walker asserts that there is no dispute of fact that the assets were worth any more than $10,000, and therefore it is entitled to summary judgment against Knutson for the amount due under his Guaranty, minus a credit of $10,000 against the total funds lent by Walker to First Layer (Defendant's Motion at 16-17).

Despite his deposition testimony, Knutson now asserts that the value of the assets transferred to Walker was substantially more than $10,000.  Ms. Masten appears to opine that the transfer to Walker provided a value of at least $1,062,500.  *See* Masten Report, Contained in Exhibit B to Walker's Motion to Exclude Expert Report, at 2.  Other evidence tendered by Knutson, including Menzel's affidavit and Steele's deposition testimony, appears to provide evidence of a different value.

Thus, while there is no dispute that assets were shipped by First Layer to Walker through the acts of Menzel, there appears to be a dispute as to exactly what was shipped, and there is certainly a dispute as to the value of those assets, as discussed below, so as to preclude the entry at this time of summary judgment as requested by Walker.

Menzel states in his affidavit that he knows that "at least some" of the assets he shipped were "used in Walker's installation services business."  Menzel Affidavit, *supra* at ¶ 3.  The basis for his knowledge is that he states he became a "full time employee of Walker in July of 2002" and held the position of Vice President of Marketing.  *Id.* at ¶ 4. He further attests that "in essence, FLC [First Layer] became Walker's installation services division" and "used many of the assets it acquired from FLC, such as (without imitation) tools, processes, plans and techniques.  *Id.* at ¶ 5.  Menzel also states that Walker "used FLC's customer information and many of the installation services customers Walker acquired came from FLC.  Walker also took over most of FLC's on-going projects and work.  Several key employees, including Pete Steele and me, became Walker employees."  *Id.* at ¶ 5.  Although he does not place a dollar value on the "assets" transferred to Walker, Menzel states that "in this way, FLC's installation services operation were rolled into Walker and became a profitable division of Walker . . . ."  *Id.*

Walker vigorously denies that it received any value from the transferred assets beyond the possible $10,000 figure stated by Knutson (Defendant's Motion at 17-19; Reply at 9-10).  In connection with its motion, Walker submitted an affidavit from Lorie Loman, Material Management and Contracts Manager for Walker, who attests, contrary to Menzel's affidavit, that Walker did not receive any of First Layer's contracts contained on a list attached to her affidavit, nor did it operate under any of such contracts.  *See* Loman Affidavit, attached to Defendant's Motion at ¶¶ 5-6.  She further states that Walker does not have any contracts with any of the entities listed in the attachment to

her affidavit, which list includes Qwest and AT&T Wireless, two companies which Menzel claims were First Layer customers whose contracts were forwarded to Walker. *Id.* at ¶¶ 7-8.

Excerpts from the deposition of Peter Steel, attached to both Walker's Motion and Knutson's Response, support and contradict to some extent Mr. Menzel's affidavit, and to some extent contradict Ms. Loman's affidavit, leaving the state of facts even more opaque.  Mr. Steel testified that he did receive a shipment from First Layer at his office in Eatonville, Washington after he was employed by Walker.  *See* Steel Deposition excerpts, Exhibit B to Knutson Response at 19.  Mr. Steel appears to deny, however, that the shipment included customer records but rather included what he describes as employee records. *Id.*  He also testified that the shipment included "technical manual for certain types of equipment" but that the equipment was so "outdated" that "its life span is over."  *Id.* at 20.  He also testified that he had no idea how much money Walker received from First Layer's accounts receivable, disclaiming any role in the financial side of Walker.  *Id.*  He also testified, when asked if the assets were put to use, that instead they were "decommissioned and used for parts because it was physically or not economically repairable."  *Id.* at 21.  No efforts were made by Walker to sell the assets according to Mr. Steel.  *Id.* at 21-22.  He also testified that he "valued all of this stuff at around $10,000."  *Id.*

On the other hand, Mr. Steel also testified, consistent with Menzel's affidavit, that when First Layer went out of business it had contracts with Qwest and AT&T Wireless. *Id.* at 23-24.  Knutson attaches a limited portion of Steel's testimony that indicates

Walker received revenues from Qwest totaling $14,670 "gross dollars" for the period January 1, 2000 to the present. *Id.* at 37. If, as Ms. Loman attested, Walker did not have a contract with Qwest, it is unclear from this testimony whether or not this revenue was derived through or in connection with First Layer's contract with Qwest.

Walker attaches a different portion of Steel's deposition testimony, omitted by Knutson, in which Mr. Steel states "we've [Walker] done no business with Qwest since First Layer closed," and under the First Layer contract "we have done zero dollars or–no activity whatsoever." Steel Deposition excerpts, Exhibit A-7 to Walker's Motion at 32. Yet, in the same deposition excerpt, Steel also testified that Walker has provided installation services to Qwest since October 2002, for which it received revenues of $14,670. *Id.* at 33.

Mr. Steel also testified that in October of 2002 he requested First Layer's contract with AT&T Wireless to "be put in Walker's name" and he "understood that it was going to take place, and we just continued on with business as normal." *Id.* at 27-28. He also testified that he later learned the transfer of the contract to Walker had not occurred, and that it was still in the name of First Layer. *Id.* at 28-29. He further testified, in the excerpts submitted by Knutson, that the "gross dollar volume for installation services Walker has received" from AT&T Wireless after January 1, 2002 was $344,907.44. Steel Deposition excerpts, Exhibit B to Knutson Response at 37. It is unclear from his testimony what portion of such revenues, if any, was received before October 2002, and what portion, if any, was received after October 2002. *Id.* Again, despite Ms. Loman's attestation that Walker did not have a contract with AT&T

Wireless, it appears that through oversight or some other means at least some revenue was derived indirectly through First Layer's contract with AT&T Wireless.  Mr. Steel testified that Walker did not have an installation group until "just after" First Layer failed. *Id.* at 39-40.

It thus appears, on this unclear state of the record, that while Walker apparently did not receive physical assets with a value in excess of $10,000, it may have received some contract rights or customer arrangements that generated revenues for it as described by Mr. Steel.  It is arguable that such revenues are part of the collateral pledged as security for the note, given the broad definition of the security described in the security agreement quoted above.  The situation is so obscure that it cannot be said to be in a state of undisputed facts.  While the revenue figures mentioned do not appear to entirely satisfy First Layer's debt to Walker, there may be some basis for a factual finding of partial payment.

Accordingly, this Court cannot determine on this state of the record that there are no disputed issues of genuine facts regarding the value of what was received by Walker after First Layer's directors voted to liquidate the company.  As there are disputed facts on the issue of what was received by Walker and what the value was, if any, this Court cannot grant summary judgment on Walker's first counterclaim or its Second Claim for Relief that Knutson owes $722,628.99.

In addition, since Walker has not provided a signed copy of the Second Amendment to the Guaranty, and since Knutson does not admit the terms of the unsigned document, the Court cannot grant summary judgment as to Knutson's liability

for amounts loaned in excess of $600,000.  As the court held in *Carolina Mills Lumber Co., Inc. v. Huffman,* 96 N.C. App. 616, 619, 386 S.E. 2d 437 (N.C. App. 1989), in order to hold a guarantor liable under a guaranty agreement, plaintiff must first establish the existence of that particular agreement.  When the guarantor denies signing the agreement, the plaintiff fails to meet its burden of proof until it produces evidence persuading the trier of fact that the alleged fact is true.  *Id.* at 439.

On the other hand, the Court finds no admissible evidence, as argued by Knutson, that the debt from First Layer to Walker was completely satisfied by the transfer of assets.  In support of this argument, Knutson has tendered the above-referenced expert report from Lari Masten stating that "as of September 13, 2002 the fair market value of the distributed assets of First Layer" was $1,062,500.  *See* cover letter to Masten Report.  Knutson contends that if Ms. Masten's conclusion is accepted by the jury, neither First Layer, nor Knutson, are liable to Walker (Knutson Response at 4).

In her valuation summary, Ms. Masten describes the assets she valued as the "assets distributed to Walker Group Inc. from First Layer, Inc. in consideration of the Security Agreement dated October 10, 2000."  *See* Valuation Summary to Masten Report.  Elsewhere in her Report she states the basis for her opinion:

> On September 13, 2002, the Board of Directors of First Layer decided to liquidate the Company.  It is our understanding that, in consideration of their Security Agreement, Walker Group exercised their right to all assets, obligations and contracts which also included but was not limited to contracts in place, current jobs in place, as well as several key employees.

22

> We are valuing the assembled assets held by First Layer
> as of September 13, 2002, and then distributed to Walker.
> We are not properly informed as to how the debts of First
> Layer were handled subsequent to this distribution.

Masten Report at 8.

Thus the premise of the Masten Report was that Walker acquired all the

collateral covered by the security agreement, notwithstanding the testimony of Knutson

and Steel, and the affidavit of Menzel, that the entire transfer of assets consisted of one

shipment from First Layer's Kansas City office.

Moreover, in her deposition, Ms. Masten testified that she believed there was

a "merger or business combination" between First Layer and Walker. *See* Masten

Deposition, Exhibit A-5 to Defendant's Motion at 58-59.  She also testified that her

opinion was based on an assumption that First Layer continued to be operated as

a "going concern." *Id.* at 68-69.

However, contrary to Ms. Masten's assumptions, there is no evidence of record

that there was a merger or business combination between Walker and First Layer.

Knutson has offered no evidence that a merger between the companies was ever voted

on by First Layer's Board of Directors or shareholders, or that such a combination ever

occurred.  Indeed, as Menzel and Leckie state in their affidavits, on September 13,

2002, the First Layer Board of Directors voted to dissolve the company.  Walker asserts

that it did not assume the debts or liabilities of First Layer, as would be required in

a merger.  *See* Leckie Affidavit at ¶ 17.  Knutson does not refute this statement.

Ms. Masten's report acknowledges that it does not account for the debts of First Layer

after September 2002.  In her deposition testimony Ms. Masten recognized that from

23

an accounting standpoint a merger would require assumption of liabilities.  *See* Masten

Deposition, *supra*, at 173.

Similarly, there is no evidence of record that First Layer was operated by Walker

as a "going concern."   Ms. Masten herself testified that First Layer as an entity "ceased

to exist" after September 2002.  Masten deposition, *supra*, at 169.  Furthermore, in her

deposition testimony she acknowledged that she did not know if Walker operated First

Layer as a "going concern."  *Id.* at 172.  As noted, the First Layer Board voted to

dissolve the company.

In fact, by the time of her deposition in January 2005, Ms. Masten acknowledged

that she did not know "what Walker received from First Layer."  *Id.*  It is clear from her

deposition testimony that notwithstanding the statements in her report, Ms. Masten did

not value what Walker in fact received from First Layer.  Rather, she "valued" what she

understood was the collateral securing the promissory note, without regard to what

Walker actually received from First Layer.  *See* Masten deposition excerpts attached as

Exhibit A to Walker's Motion to Exclude Expert Evidence and Testimony of Lari Masten,

at 82-85.

The value calculated by Ms. Masten, which is a hypothetical value of what First

Layer was "worth" at the time the directors voted on dissolution, and what Walker might

have received had it foreclosed on its security interest, is not the issue here.  The issue

is what value, if any, was actually received by Walker as a payment or partial payment

of the First Layer note.  Ms. Masten's report does not shed light on that issue, and

therefore does not provide admissible evidence that the note was paid in full, as

Knutson contends in his complaint for declaratory judgment.

Knutson appears to argue in the alternative that the "acceptance" by Walker

of the assets sent by Menzel constitutes a full satisfaction of First Layer's debt by

operation of provisions of the Uniform Commercial Code (Knutson's Response at 5-8).[2]

Essentially, Knutson argues that because Walker accepted the assets sent to it, but

failed to provide notices required by the operation of sections N.C. Gen Stat. §§ 25-9-

620 and 25-9-621 when a secured party forecloses on collateral of a debtor, there is

a presumption under N.C. Gen Stat. § 25-9-626(a)(4) that "the assets received had a

value equal to the amount of the debt, and therefore extinguished the debt."  (Knutson's

Response at 5).

Knutson is correct that N.C. Gen Stat. § 25-9-626(a) establishes "rules" that

apply in a civil action arising from a secured transaction in which the amount of

deficiency is at issue.  Subsection (3) of that section provides that if a secured party

fails to prove that the "collection, enforcement, disposition, or acceptance" was in

compliance with the provisions of part 6 of Article 9 of the UCC, the liability of the debtor

or second obligor for a deficiency is limited as provided below in that subsection. N.C.

Gen Stat. § 25-9-626(a)(3).  Thereafter, subsection (a)(4) of the section provides that

the amount of proceeds that would have been realized had the secured party complied

---

[2]   The parties here cite generally to sections of the Uniform Commercial Code without specifically citing to the statutory provisions of the Code as adopted in North Carolina.  The Court notes that both the Agreement, and the security agreement, expressly provide that they are governed by the laws of North Carolina.  Thus, although the parties did not do so, the Court cites to the UCC provisions as adopted by North Carolina.

with the provisions of part 6 of Article 9 of the UCC is "equal to the sum of the secured obligation," unless the secured party proves that the amount received is less than that sum.  N.C. Gen Stat. § 25-9-626(a)(4).

Thus, N.C. Gen Stat. § 25-9-626 requires compliance with the formalities of part 6 of Article 9 of the UCC if a secured party forecloses on collateral, otherwise a rebuttable presumption of full satisfaction attaches to the collateral taken by the creditor.  Knutson's argument under this section fails, however, to establish that Walker received full satisfaction of First Layer's debt for two reasons.

First, as noted, the presumption of full satisfaction is a rebuttable one.  Here, there is evidence rebutting the presumption coming from Knutson himself who testified that the value of the assets transferred to Walker was "Minimal. Ten thousand [dollars]" Knutson Deposition, *supra*, at 209.  As discussed above, the Menzel affidavit and Steel deposition testimony suggest other amounts that Walker may have received, but provide no indication that Walker received in excess of $1 million.

Second, the application of the "rules" of N.C. Gen Stat. § 25-9-626 first require that the secured party is operating under the part 6 of Article 9 in foreclosing on the assets of the debtor.  That is, the secured party must be enforcing its security interest.

Here, the evidence does not support a conclusion that Walker exercised its rights under the security agreement and foreclosed on First Layer's assets.  Walker asserts that because First Layer had "no real hard assets" it did not "exercise any of its rights under the Security Agreement."  Leckie Affidavit at ¶ 17.  Knutson himself admitted that he had no knowledge of Walker taking any of First Layer's accounts receivable.

26

Knutson Deposition, *supra*, at 184.  Based on Menzel's affidavit, which appears to be the only evidence regarding the circumstances of the transfer of assets to Walker, it appears that the transfer was voluntarily made by First Layer.  Although Menzel states that he believed Walker would "seize all FLC's assets" under the security agreement, he provides no evidence that this occurred.  Rather, he states he simply packed up all the assets and shipped them off to Walker's office.  Menzel Affidavit, *supra,* at ¶ 3.

The comments to N.C. Gen Stat. § 25-9-620 of the UCC expressly address a situation where a debtor voluntarily sends collateral to a secured party. "A debtor's voluntary surrender of collateral to a secured party and the secured party's acceptance of possession of the collateral does not, of itself, raise an implication that the secured party intends or is proposing to accept the collateral in satisfaction of the secured obligation under this section."  Official Comment 5 to N.C. Gen Stat. § 25-9-620. In a case of voluntary surrender of collateral by a debtor, there is no requirement, as Knutson argues, that the secured party send the "proposal" to accept collateral required by N.C. Gen Stat. § 25-9-621(a).  Nor is there a requirement, as Knutson argues, that the secured party obtain the "debtor's consent to the acceptance" as required under N.C. Gen Stat. § 25-9-620(a)(1), or that the collateral is accepted because the secured party failed to receive a "notification of objection to the proposal," as required under N.C. Gen Stat. § 25- 9-620(a)(2).  Under the circumstances presented here, these provisions of the UCC do not apply to trigger the presumption set forth in N.C. Gen Stat. § 25-9-626(a)(4) that the value of the collateral received is equal to the sum of the obligation.

For these reasons, the Court finds that Knutson has failed to adduce any admissible evidence or arguments of law to permit an inference that the obligation of First Layer to Walker was fully satisfied by the transfer of assets in September 2002. Accordingly, the Court concludes that Walker is entitled to summary judgment as to Knutson's claim for declaratory relief, seeking a declaration that Walker has received assets of First Layer that "more than satisfy First layer's obligations" and that he is "not liable to [Walker] for any amounts pursuant to the note or the Guaranty."

**CONCLUSION**

For the reasons set forth above, Walker's Motion for Partial Summary Judgment (Dkt. # 112) is GRANTED in part and DENIED in part.

The motion is granted with respect to the two claims for relief alleged in plaintiff Knutson's complaint in Civil Action No. 03-F-1973, and those two claims are dismissed with prejudice.

The motion is denied with respect to Walker's First Counterclaim for Relief alleged in Civil Action No. 03-F-1973, and with respect to plaintiff Walker's Second Claim for Relief for breach of guaranty alleged in Civil Action No. 04-F-2112.

DATED:  August 12, 2005.

BY THE COURT:

s/ Phillip S. Figa

_____

Phillip S. Figa
United States District Judge